FIRST DISTRICT
SIXTH DIVISION
MARCH 31, 2011

No. 1-10-0540



JOHN LEWIS,

        Plaintiff-Appellant,

v.

CHICA TRUCKING, INC., an Illinois Corporation,

        Defendant-Appellee

(SRF P.C. Trucking Corporation, Acorn Garage, Inc., and Midway Auto Truck Service, Inc.,

        Defendants).

Appeal from the
Circuit Court of
Cook County.

No. 06 L 13436

Honorable
Thomas P. Quinn,
Judge Presiding.

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion. Presiding Justice Garcia and Justice McBride concurred in the judgment and opinion.

## OPINION

Plaintiff John Lewis brought suit for negligence against defendants Chica Trucking, Inc., SRF P.C. Trucking Corp., Acorn Garage, Inc., and Midway Auto Truck Service, Inc., after plaintiff sustained injury in an accident on December 29, 2004, when the brakes failed on the truck he was driving. Defendant Chica Trucking (Chica) filed a motion for summary judgment, claiming that it did not owe plaintiff a duty to inspect or repair his truck. The trial court granted summary judgment in Chica's favor, finding that Chica did not owe plaintiff a duty as a matter of law. Plaintiff appeals, arguing that Chica owed him a duty to inspect and repair the truck based

on its voluntarily undertaking to inspect and repair the truck. We affirm the grant of summary judgment.

BACKGROUND

The facts of this case come primarily from the deposition testimony of the parties. SRF P.C. Trucking Corporation (SRF) was an Illinois corporation organized in June or July 2004 for the purpose of purchasing and running a truck to transport goods. Fred Rabinowitz, the president of SRF and a partner at the law firm of Schaffner Rabinowitz & Feinartz, P.C., formed the company with David Feinartz, a law partner at the firm, and Jeff Hollingshead. Rabinowitz and Feinartz knew Hollingshead as client of the law firm, and it was Hollingshead's idea to start the company. Rabinowitz had no experience with trucks, but testified at his deposition that Hollingshead "was more into that" and knew drivers and how to run the trucking business. Rabinowitz testified that "the idea was to run the truck, lease it out, and hopefully make some side money."

Hollingshead was friends with John Spina, who was married to Patricia Cortez, the owner, president, and treasurer of Chica. Chica, like SRF, was a trucking broker that contracted to haul debris from construction sites. Rabinowitz testified, "[a]s far as the trucking company is concerned, we didn't have any real contact with [Spina] other than he knew the trucking business. I don't know if Jeff [Hollingshead] spoke with him about where do you find drivers, where do you dispatch and stuff like that." Spina testified that he did not have any conversations with Hollingshead about providing assistance for SRF in purchasing a truck other than advising Hollingshead to look in magazines.

On July 12, 2004, after SRF purchased a used Mack truck, SRF sent it to Acorn Garage (Acorn) for a "complete inspection and overhaul." Spina had taken trucks to Acorn in the past, but did not suggest to Hollingshead that he take SRF's truck there; Spina testified that Hollingshead "knew Acorn himself" from "being in the neighborhood." Rabinowitz did not deal with Acorn directly, but found out from Hollingshead that the repair work, mostly involving the truck's brakes, was costing more money than they had anticipated. Rabinowitz gave Hollingshead "an okay to go ahead and do what they had to do."

SRF owned only one truck and plaintiff was its only driver. At the time of the December 29, 2004, accident, plaintiff had been employed by SRF for approximately five months. At his deposition, plaintiff testified that his duties were to take SRF's truck to jobsites and "haul[] spoils and pick[] up gravel." The truck was kept in the "yard," which was a lot located in Chicago that was large enough to hold 10 to 15 trucks. The trucks in the yard were owned by various companies and individuals, including SRF and Chica. The yard was fenced and had a gate that had to be unlocked with a key. Plaintiff testified that "[t]he lady" from Chica provided him with a key to the gate.

Hollingshead hired plaintiff to drive the truck; Rabinowitz had no involvement in interviewing or hiring him, and did not meet plaintiff until after he had been hired. Rabinowitz testified that when plaintiff had problems with the paperwork after he was hired, he was assisted by Spina. Rabinowitz also believed that Cortez assisted plaintiff in filling out paperwork and Cortez confirmed that she did. Plaintiff testified that Spina was present when he began working for SRF and provided plaintiff with instructions.

3

Rabinowitz testified that the procedure for truck hauling assignments was that plaintiff would call Luise Trucking (Luise), a company that contracted to remove debris, and receive his assignment. The people at Luise were people whom Hollingshead knew, and Rabinowitz recalled going to Luise's office with Hollingshead near the time SRF purchased the truck. Spina also worked for Luise at one time, and Chica contracted its business to Luise, which would call Chica to direct it to jobsites. Rabinowitz testified that plaintiff was to contact Luise directly for assignments. Plaintiff testified that he received a daily telephone call from Chica, informing him what hours he was to work the next day and where he would be working.[1] Plaintiff did not receive any assignments from anyone other than Spina or Cortez. Based on plaintiff's telephone records, attached to his response to the motion for summary judgment, plaintiff's telephone and Cortez's telephone made contact approximately 127 times between July 16, 2004, and December 29, 2004, and plaintiff's telephone and Spina's telephone communicated approximately 111 times during that same period.

Plaintiff also testified that he was told to "[f]ollow Johnny," meaning that he was to drive his truck to the same locations as the Chica trucks, and that he and the drivers for Chica's two trucks would normally meet at the yard and "ran together."

[1] When asked to whom he was referring when he said "Chica," plaintiff responded, "Johnny's wife or Johnny." Plaintiff did not know Johnny's last name but later referred to him as "Johnny Chica" and could not recall Johnny's wife's name, saying he thought it was "Kathy or something." The record indicates that "Johnny" is John Spina and "Johnny's wife" is Patricia Cortez.

Plaintiff would fill out two sets of paperwork for each job: one for Luise and one for SRF. Rabinowitz testified that Hollingshead usually picked up plaintiff's time sheets but that sometimes plaintiff dropped them off himself. However, plaintiff testified that when he went on assignments, someone at the work site would provide him with a voucher, which plaintiff left in the truck at the end of the day for Spina to pick up.

Rabinowitz testified that if plaintiff had any problems with the truck, he was to call Hollingshead. Plaintiff testified that the only regular contact he had with Hollingshead was to pick up his weekly paycheck and that he called Spina or Cortez in case of emergencies, such as when "something was wrong with the truck or [plaintiff] needed some information." Plaintiff estimated that over the five months he worked at SRF, he telephoned Spina or Cortez approximately 10 to 15 times concerning the truck. Rabinowitz generally did not become aware of repairs made to the truck until he was billed for the repairs.

Plaintiff testified that he had heard air leaking from the brakes of the truck several times prior to the accident. He also had problems with the brakes at least twice before December 2004, in approximately September and October 2004. When the first incident occurred in September 2004, he reported it to Spina, who directed him to take the truck to the repair shop. Plaintiff brought the truck to Midway Auto Truck Service (Midway) to be repaired. He told a man that he identified as the owner of Midway that the truck was leaking air and that "something is wrong." He also said that "I want to make sure that nothing happens to me in this truck." In response, the owner told plaintiff that he would "check it out." The owner later told plaintiff that Midway "made a few adjustments with the lines and a couple of pins or something in it, you know, to stop

the air leakage and stuff." Plaintiff later testified that he observed someone under the truck, inspecting the brake lines and observed the person putting in new brake lines. Plaintiff testified that the repair took approximately one hour, and it was paid for by charging it to the account that Chica kept with Midway; plaintiff testified that Spina directed him to charge the repair to Chica's account.

The second incident also involved plaintiff hearing air leaking from the brakes, as well as the clutch being "too low" and problems with the truck cab's heater; there was also a problem with the door opening when plaintiff drove over bumps in the road. He brought it to Midway again, where the owner said it would take the entire day to inspect the truck. Plaintiff spoke to Hollingshead on the telephone and he told plaintiff not to leave the truck with Midway, so plaintiff drove the truck back to the yard. Midway worked on the truck slightly during that visit and made some adjustments to the clutch and fixed the heater; plaintiff did not think that any work was done on the brakes. Plaintiff knew that the clutch adjustment had been made because the owner of Midway told him so and plaintiff could tell that an adjustment had been made when he drove the truck. Again, plaintiff testified that the work was charged to Chica's account. Plaintiff further testified that he also informed Hollingshead of the problems with the air leaking, but that it was Spina who told him to take the truck to Midway.

*Conversation With Cortez*

Approximately two days before the accident, plaintiff testified, he took the truck to Acorn, located directly across the street from the yard, and told someone there that "something was wrong with the brakes." While he had been driving the truck, plaintiff noticed "[s]lippage" with

6

the brakes, which he described as "[s]ometimes they stopped, sometimes they didn't." Plaintiff described an incident in which he was trying to slow the truck, but the brakes "went to the floor" and he was only able to stop the truck by using the clutch; plaintiff observed that the brakes were slowing the truck down and were not immediately responding. Plaintiff testified that when the slippage occurred, "that's when I knew something was wrong with [the brakes]."

Plaintiff did not report the problem to SRF, because he had been instructed by Hollingshead to report everything to Spina; however, plaintiff later testified that he brought the problem to Hollingshead's attention. Plaintiff called Spina, who told him to take the truck to Acorn, and he did. Plaintiff testified that he spoke directly with someone at Acorn concerning the problems with the brakes, and he testified that the person at Acorn told him to "put it in the yard" because there was no room for the truck in the garage. Plaintiff then received a call back from Cortez, who also told him to "put it in the yard" and said "they'll look at it." Someone from Acorn told plaintiff that Acorn would examine the truck later; plaintiff testified that the Acorn employee "told me they was going to look at it." Plaintiff later testified that Cortez "said they'll look at it. She said they said they going to look at the brakes."

The next day, plaintiff received a phone call from Cortez. Plaintiff testified that he "got a phone call from Chica saying that they couldn't find anything wrong with the truck. That's my last time I had anything to do with Acorn over there, when she told me that Acorn couldn't find anything wrong with the brakes." When asked whether the Acorn employee looked at the truck, plaintiff responded, "[n]o, not that I know of."

In her deposition, Cortez testified that she did not arrange for any service or maintenance

for any truck other than the two Chica trucks in 2004, and she did not have any knowledge of any service or maintenance performed on plaintiff's truck. There was a phone log introduced during Cortez's deposition showing that her cell phone had made a call to plaintiff's phone on December 26, 2004. However, neither of the phone numbers belonging to Cortez had communication with plaintiff either the day before or the day of the accident.

Additionally, Acorn answered several requests to admit propounded by Chica:

"1. Admit that at no time prior to December 29, 2004, did any agent, representative, employee or officer of Chica Trucking, Inc. ever request or order that any work be performed on a truck owned by SRF P.C. known as SRF Truck No. 177 ***.

RESPONSE: Defendant admits that at no time prior to December 29, 2004 did any employee or representative of Chica Trucking request or order Acorn Garage to perform work on SRF P.C. Truck No. 177. As to balance of request, Defendant cannot admit or deny whether Chica Trucking requested or ordered work from any other entity.

2. Admit that at no time prior to December 29, 2004, did any agent, representative, employee or officer of Chica Trucking, Inc. ever pay for any work that was performed on a truck owned by SRF P.C. known as SRF Truck No. 177 ***.

RESPONSE: Defendant admits that at no time prior to

December 29, 2004, that any employee or representative of Chica Trucking paid Acorn Garage in connection with SRF P.C. Truck No. 177. As to the remainder of request, Defendant cannot admit or deny whether Chica paid any other entity for work on SRF P.C. Truck No. 177.

3. Admit that at no time prior to December 29, 2004, did any agent, representative, employee or officer of Chica Trucking, Inc. ever recommend that any work be performed on a truck owned by SRF P.C. known as SRF Truck No. 177 ***.

RESPONSE: Defendant admits that Chica Trucking did not recommend to Acorn Garage that any work be performed on a SRF P.C. Truck No. 177. As to remainder of request, Defendant cannot admit or deny whether Chica Trucking recommended work be performed on subject truck to any other entity.

4. Admit that at no time prior to December 29, 2004, did any agent, representative, employee or officer of Chica Trucking, Inc. ever deliver such a truck for work owned by SRF P.C. known as SRF Truck No. 177 ***.

RESPONSE: Defendant admits that no Chica employee or representative delivered SRF P.C. Truck No. 177 for work to Acorn Garage; Defendant cannot admit or deny whether such a

9

request was made by Chica Trucking, Inc. to other entities.

    5.  Admit that at no time prior to December 29, 2004, did any agent, representative, employee or officer of Chica Trucking, Inc. ever authorize work to be done on a truck owned by SRF P.C. known as SRF Truck No. 177 ***.

    RESPONSE: Defendant admits that no Chica employee or representative authorized work to be done by Acorn Garage on a SRF P.C. Truck No. 177; Defendant cannot admit or deny whether such an authorization was made by Chica Trucking, Inc. upon another entity."

Plaintiff testified that he never told any of his "bosses" that he was refusing to drive the truck but simply informed them of the problems. He also never told his "bosses" that he wanted the problems to be fixed or that he would report the problems to any sort of agency. Plaintiff further testified that he felt unsafe driving his truck for approximately a week prior to the accident, "[k]nowing maybe I can't stop." He felt that the repair shops Hollingshead had referred the truck to "were taking their time about fixing it."

*December 29, 2004, Accident*

On December 29, 2004, plaintiff testified that he received a phone call at approximately 8:30 or 9 a.m. from Cortez, telling him to report to a dump site at the intersection of Indiana Avenue and Roosevelt Road in Chicago. Plaintiff testified that he did not want to go to the site because "something told me not to go," but went to the site because he had only worked one day

that week. When he arrived at the yard to pick up the truck, plaintiff "checked the truck out," as was his custom.

When he checked the truck, plaintiff walked around the truck, checking for flat tires and nonworking lights. Plaintiff acknowledged that federal regulations required him to perform the safety check before he left, and he testified that he was required "[t]o check to make sure that the windshield wipers, lights, the truck has no flat tires, the brakes and lights are working." Plaintiff described the condition of the truck as "[f]ine." If plaintiff ever discovered anything wrong with the truck during the safety check, he informed Spina, and Spina would tell him to take the truck to the shop.

After performing the inspection, plaintiff drove the truck to the work site. On the way to the work site, plaintiff did not notice any problems operating the truck. After loading his truck, plaintiff drove southbound on Interstate 55 to the dump to unload the spoils. On the way to the dump, plaintiff did not notice any problems operating the truck on Interstate 55, and the brakes were operational as plaintiff was slowing to exit. Plaintiff exited Interstate 55 at Route 53 in Bolingbrook; the exit ramp had a downward slope. Plaintiff decelerated from 55 miles per hour to approximately 25 to 30 miles per hour on the ramp by "downshifting" in addition to "using the clutch and the brake." Plaintiff described the ramp as curving to the right, with a stoplight at the end of the ramp; the stoplight turned red as plaintiff was exiting. The ramp began as two lanes, then branched into three lanes, with two turn lanes to the right and one turn lane to the left.[2]

---

[2] Plaintiff testified that the configuration of the exit ramp onto Route 53 changed between the time of the accident and the time of his deposition in April 2008.

There was no median where the lanes split, but the lanes were separated by "lines." Plaintiff intended to turn right at the stoplight, onto Route 53, and was in the rightmost lane. There were two automobiles stopped in front of him in the same lane and two automobiles stopped in the other right turn lane. Plaintiff described the traffic on Route 53 as light.

Plaintiff was unable to stop the truck, and he found no automobiles in the left turn lane, so he changed lanes. Plaintiff estimated that he was approximately four car lengths from the stoplight when he first realized his brakes were not working and was approximately two car lengths from the stoplight when he changed lanes. Plaintiff steered the truck to the left and was depressing both the brake and clutch; the truck did not slow down because plaintiff had a full load in the back of his truck. Plaintiff collided with another truck that was stopped on Route 53. Plaintiff testified that he "aimed" for the other truck because he believed that "the truck is the only thing that's going to stop" him.

Plaintiff was ejected from the truck in part because the seat belt was not working properly. The truck contained a lap belt that would not remain taut; the belt would latch into place, but would remain loose on the driver's lap. Plaintiff could not remember when the seat belt had stopped working but testified that "[i]t worked at first and then all of a sudden it stopped working." Plaintiff estimated that the seat belt stopped working approximately a week before the accident. Plaintiff reported the problem to Spina, but could not remember Spina's response. He brought the truck to Midway, but Midway did not repair the seat belt, and plaintiff continued to operate the truck with the nonfunctioning seat belt.

Additionally, at the time of the accident, the truck's driver's side door was not functioning

12

properly. The door swung open when the truck made turns and was held closed by a bungee cord. The door had been held shut in this way for approximately two to three weeks prior to the accident. Plaintiff opined that the problem with the door was the result of a problem on the hinges of the lock. Plaintiff complained to Spina about the door, and Spina informed plaintiff that Midway would order a door latch. Plaintiff testified that he also made Hollingshead aware of the problems with the seat belt and the door.

As a result of the accident, plaintiff was hospitalized for 14 days and required several surgeries. Plaintiff's injuries included permanent scarring on his left arm and hand, skin grafts on his arm and legs taken from his upper thighs, the loss of the "first digit" of his thumb, and fractured vertebrae in the lower portion of his spine.[3]

*Complaint*

Plaintiff brought suit against Chica, SRF, Acorn, and Midway,[4] claiming that they were negligent in a number of ways relating to the maintenance of the truck. Specifically, plaintiff alleged that each defendant

"was negligent in one or more of the following ways:

a. Failed to fix the truck's seatbelt;

b. Knowingly dispatched and instructed the Plaintiff, JOHN

---

[3] Plaintiff did not know how many vertebrae were fractured.

[4] SRF was later dismissed from the suit because it was plaintiff's employer and the proper remedy would have been a workers' compensation claim. Additionally, plaintiff reached a settlement with Acorn, which was also dismissed from the suit.

LEWIS, to drive the truck without a properly functioning seatbelt;

     c. Failed to repair the driver's side door which was held closed by a bungee cord;

     d. Knowingly dispatched and instructed the Plaintiff, JOHN LEWIS, to drive the truck with the driver's side door closed with a bungee cord;

     e. Failed to repair the truck's brakes;

     f. Knowingly instructed the Plaintiff, JOHN LEWIS, to drive the truck with improperly working brakes;

     g. Knowingly dispatched the Plaintiff, JOHN LEWIS, to drive to a job site with a truck that was not equipped with properly working brakes, seatbelt or a driver's side door."

Plaintiff's complaint also included an allegation that SRF and Chica had contracted for Chica to perform the maintenance on the truck, an allegation that was seemingly abandoned prior to the motion for summary judgment

During discovery, the parties testified to the relationship between Chica and SRF. Plaintiff acknowledged that he did not work for Chica. He further testified that he believed that Spina worked for Chica. When asked how he knew that Spina worked for Chica, plaintiff explained that it was because "[h]e drove his own truck some time" and because "he told me it was his business, his trucks." Plaintiff used Spina's credit card to purchase fuel for his truck until Hollingshead provided plaintiff with a card to use.

14

However, Rabinowitz testified that "[t]here was no relationship" between SRF and Chica. Rabinowitz testified that, to the best of his knowledge, Chica never extended money on behalf of SRF and SRF never wrote any checks to Chica. Rabinowitz acknowledged that there was a receipt from Carson Tire Service that was addressed to "Pat Cortez of Chica," but he had "no idea" why it was addressed to her; Rabinowitz testified that the document was signed by plaintiff and that SRF paid the bill, which was approximately $30.

Spina testified that Chica was owned and operated by Cortez, but that he had never been an employee or independent contractor for Chica. At the time of the accident, Spina was not employed, although he "might have drove [*sic*] for [his] wife a couple times. Not that often." Spina testified that when he drove for his wife, he did so gratuitously. Spina did not direct Chica drivers to drive the Chica trucks. Spina knew plaintiff "from parking in the yard" and would "kid around" with plaintiff when he saw him in the yard. Spina testified that he may have run into plaintiff on work sites occasionally.

Spina testified that he did not recall ever instructing plaintiff to take his truck to Midway, nor did he recall having any conversations with plaintiff about taking his truck to Midway. Spina testified that on occasion, plaintiff could not reach Hollingshead and Spina called Hollingshead to inform him that plaintiff wanted to be paid or had problems with his truck; Spina further testified that if he ever told plaintiff to take his truck to be fixed, it was in the context of relaying a message from Hollingshead. Spina said that he "didn't directly tell Mr. Lewis where to take that truck because it wasn't mine for number one." Spina testified that the only time he heard about problems with the brakes was after plaintiff's accident.

15

Cortez testified that Spina never had any position of employment or contract work with Chica. He drove Chica's trucks occasionally but did not get paid; Cortez testified that Spina drove her trucks "[i]f [she] didn't have someone to drive and had a job to do." She estimated that Spina drove one of her trucks fewer than five times in 2004.

Cortez testified that plaintiff was not one of Chica's contracted drivers. She further testified that Chica did not have any in-house maintenance and would take the trucks to Acorn and Midway to be serviced. However, she did not instruct any other truck drivers about where to take any trucks that needed maintenance. Cortez testified that plaintiff never contacted her about any problems he was having with his truck, nor did she ever direct him to take his truck to Acorn or Midway.

In its answer to Chica's request to admit, Midway admitted that no "agent, representative, employee or officer of CHICA TRUCKING, INC.," "ever request[ed] or order[ed] that any work be performed on a truck owned by SRF P.C.," "ever pa[id] for any work that was performed on a truck owned by SRF P.C.," "ever recommend[ed] that any work be performed on a truck owned by SRF P.C.," "ever deliver[ed] such a truck owned by SRF P.C.," or "ever authorize[d] work to be done on a truck owned by SRF P.C."

*Summary Judgment*

On June 12, 2007, Chica filed a motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2004)), which was denied. Chica then filed a motion for summary judgment on October 6, 2009, arguing that Chica had no duty to maintain the truck. In response, plaintiff argued that Chica had voluntarily undertaken a duty to inspect

16

and repair the truck.

After a hearing on the motion, the trial court granted summary judgement in Chica's favor on January 22, 2010. In its order, the court found that plaintiff had failed to submit evidence from which a reasonable person could conclude that Chica owed him a duty with respect to the truck. The court, relying on *Chisolm v. Stephens*, 47 Ill. App. 3d 999 (1977), noted that plaintiff's testimony that he reported problems to Chica and Chica told him where to bring the truck for repairs was "inconsequential," because even if Chica had gratuitously assumed a duty to protect plaintiff, it was under no obligation to continue that protection indefinitely.

The court further found that "there is no evidence that Chica: (1) did anything to aggravate or make the condition of the truck more dangerous; (2) misrepresented that it had fixed any condition; (3) misrepresented what the condition of the truck was on the day of the accident; or (4) prevented plaintiff from obtaining information as to the condition of the truck."

Finally, the court held that even if Chica had a duty, it would still be entitled to summary judgment because plaintiff testified that Cortez told him that Acorn had examined the brakes and could not find anything wrong. "In other words, plaintiff knew that the brakes were faulty and knew that nothing had been done to fix them. He was not told that the brakes were fixed." The court concluded that "plaintiff's own testimony shows that he was not under any misapprehension that the brakes had been fixed." Plaintiff timely appealed.

ANALYSIS

Plaintiff argues that the trial court erred in granting summary judgment in favor of Chica. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and

17

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

"Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

" 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at

708 (quoting *Luu*, 323 Ill. App. 3d at 952). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

To state a cause of action for negligence, a plaintiff must allege facts in his complaint that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006) (citing *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 421 (2004)). Whether Chica owed plaintiff a duty of care is a question of law for the court to decide. *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155, 158 (1995); *Marshall v. City of Centralia*, 143 Ill. 2d 1, 6 (1991).

In the case at bar, plaintiff claims that Chica owed him a duty to inspect and repair the brakes on his truck under the voluntary undertaking theory of liability. Under that theory, "one who gratuitously or for consideration renders services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care or ' "such competence and skill as [one] possesses." ' " *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992) (quoting *Cross v. Wells Fargo Alarm Services*, 82 Ill. 2d 313, 317 (1980), quoting *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 74 (1964)); *Wakulich v. Mraz*, 203 Ill. 2d 223, 241 (2003). This theory of liability for negligence is expressed in section 323 of the Restatement (Second) of Torts, which has been adopted by Illinois courts. See, *e.g.*, *Vancura v. Katris*, 238 Ill. 2d 352, 381-82 (2010); *Wakulich*, 203 Ill. 2d at 243; *Frye*, 153 Ill. 2d at 32. Section 323 provides:

"One who undertakes, gratuitously or for consideration, to

render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts §323 (1965).

The duty of care is limited to the extent of the voluntary undertaking. *Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 239 (1996); *Frye*, 153 Ill. 2d at 32. Thus, the theory is construed narrowly. *Fichtel v. Board of Directors of the River Shore of Naperville Condominium Ass'n*, 389 Ill. App. 3d 951, 961 (2009). Accordingly, to determine whether Chica breached a duty it owed to plaintiff, we must determine the extent of any voluntary undertaking.

Plaintiff alleges that Chica:

"a. Failed to fix the truck's seatbelt;

b. Knowingly dispatched and instructed the Plaintiff, JOHN LEWIS, to drive the truck without a properly functioning seatbelt;

c. Failed to repair the driver's side door which was held closed by a bungee cord;

d. Knowingly dispatched and instructed the Plaintiff, JOHN LEWIS, to drive the truck with the driver's side door closed with a

20

bungee cord[.]"

There was no evidence concerning allegations (a) through (d) and plaintiff admitted at oral argument that allegations (a) through (d) are not at issue.

Plaintiff claims that Chica voluntarily undertook a duty to "inspect and repair the defective brakes on the Plaintiff's truck when Patricia Cortez, the Defendant's president, told the Plaintiff that a garage would look at the truck." The conversation in the record that plaintiff cites to in support of the duty comes from plaintiff's deposition, where he testified that "[s]he said they'll look at it. She said they [Acorn] said they going to look at the brakes." Plaintiff later testified that he "got a phone call from Chica saying that they couldn't find anything wrong with the truck. That's my last time I had anything to do with Acorn over there, when she told me that Acorn couldn't find anything wrong with the brakes." Since this case arises on Chica's motion for summary judgment, we consider the record in the light most favorable to plaintiff and, therefore, assume that plaintiff's recollection of the conversations with Cortez is true.

However, despite our acceptance of plaintiff's version of events as true, we cannot find any duty by Chica to "inspect and repair the defective brakes on the Plaintiff's truck." The conversations show that at most, Chica, through the actions of Cortez, undertook a duty to ensure that *Acorn* examined the brakes. There is no indication that Chica would perform any inspection itself, nor that Chica would repair plaintiff's brakes. Moreover, plaintiff would have been aware that Chica was not performing any inspection or repair services itself, since every time plaintiff complained to Chica about problems with the truck, he testified that he was referred to a repair shop. In fact, during the incident at issue, plaintiff testified that he initially took the truck to

21

Acorn, described the problem with the brakes to someone who worked at Acorn, and the person from Acorn told him to take the truck back to the yard and that Acorn would "look at it." However, the issue here does not concern any voluntary undertaking by Acorn. Thus, the only way that Chica could be liable for a voluntary undertaking would be if it had voluntarily undertaken to ensure that plaintiff's brakes were inspected. Therefore, subsection (e) of plaintiff's complaint, which states that Chica "[f]ailed to repair the truck's brakes" was properly dismissed by the trial court on summary judgment because plaintiff has offered no evidence that Chica had a duty to repair the brakes.

Assuming *arguendo* that Chica had undertaken a duty to ensure that plaintiff's brakes were inspected, we would then have to consider whether there are facts that support plaintiff's claim that Chica breached its duty to ensure that Acorn examined the plaintiff's brakes. See *Rhodes*, 172 Ill. 2d at 239-40 (finding that the voluntary undertaking of the defendant railroad was not a duty to ensure that aid was provided to the injured plaintiff, but at most, reporting the plaintiff's presence to the police); *Frye*, 153 Ill. 2d at 33-34 (finding that the defendant pharmacist had a duty to ensure that the warning labels placed on a prescription bottle were accurate, not a duty to warn of all possible side effects).

The voluntary undertaking doctrine applies to both misfeasance – performing the undertaking negligently – and to nonfeasance – failure to perform the undertaking. *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 996 (2005); see also Restatement (Second) of Torts §323 (1965). In the case at bar, since plaintiff claims that Chica failed to perform its duty, we consider whether there is evidence supporting liability through nonfeasance and find that there is not.

22

Plaintiff points to the accident that occurred and his testimony that the brakes failed, as well as Cortez's testimony that she did not have any knowledge of any service or maintenance performed on plaintiff's truck, to support his contention that Chica breached its duty. However, these facts are insufficient to show that a duty was breached. Simply from plaintiff's deposition testimony, it is apparent that the truck was inspected and repaired on several occasions, yet continued to have problems. Thus, the fact that the brakes failed does not mean that the truck was not inspected by Acorn on this occasion. Acorn's answer to Chica's request to admit only states that Chica did not request Acorn to inspect the truck. Nothing in the answer tells us whether Acorn inspected the truck in the lot by itself since plaintiff testified that Acorn told him it was going to inspect it. Similarly, the fact that Cortez was not familiar with any "service or maintenance" performed on the truck does not establish that she breached her duty. If Acorn had inspected the truck and had found nothing wrong, then there would have been no "service or maintenance" needed.

Moreover, there is no evidence showing what information, if any, Acorn conveyed to Cortez. Cortez was not a mechanic, nor was she the person performing the inspection on the truck. Her role in the truck's inspection was limited to relaying the information provided by Acorn to plaintiff. If Acorn was at fault, either by performing the inspection negligently or by not performing the inspection at all, then any information provided to plaintiff could have been incorrect even though Cortez had properly performed her duty by relaying the information to plaintiff. It is plaintiff's claim that since Cortez denies that plaintiff ever contacted her about any problems he was having with his truck, his testimony standing alone is enough to defeat a motion

23

for summary judgment.

We agree with plaintiff that, contrary to the trial court's reasoning, the case at bar is distinguishable from *Chisolm*, which the trial court used to support its decision to grant summary judgment to Chica. In that case, a plaintiff tenant fell and was injured when the defendant landlord failed to clear the sidewalk in front of the plaintiff's residence, which was covered with a layer of ice. *Chisolm*, 47 Ill. App. 3d at 1002. The plaintiff claimed that the defendant's consistent removal of snow and ice over the past 15 years, and her reliance on that removal, gave rise to a legal duty for defendant to clean the sidewalk each morning. *Chisolm*, 47 Ill. App. 3d at 1005. The court disagreed, noting that "even a person who has gratuitously assumed to protect others against injury is under no obligation to continue that protection indefinitely." *Chisolm*, 47 Ill. App. 3d at 1006 (citing *Hubbard v. Aetna Insurance Co.*, 37 Ill. App. 3d 666, 671 (1976)). Additionally, the court found that the reliance of the plaintiff on the defendant's performance in the past, without more, was insufficient to give rise to a duty to clean the sidewalks on the morning of the accident. *Chisolm*, 47 Ill. App. 3d at 1007. Thus, the court held that there was no duty to clear the sidewalk. *Chisolm*, 47 Ill. App. 3d at 1009.

Here, plaintiff argues that the voluntary undertaking was not based on Chica's performance in the past, but instead was based on Cortez's affirmative statement that Acorn was "going to look at the brakes." Accordingly, *Chisolm* is inapposite.

However, we also find plaintiff's claimed support in *Bourgonje* unpersuasive. In *Bourgonje*, the plaintiff tenant was attacked in front of her apartment building and claimed that the defendant landlord had breached her duty to protect against such attacks by providing security

24

lighting. *Bourgonje*, 362 Ill. App. 3d at 986-87. The court found that there were sufficient facts to survive summary judgment because the plaintiff had claimed that the defendant specifically agreed to light the mansion in order to protect her from attacks late at night. *Bourgonje*, 362 Ill. App. 3d at 1003. The court's conclusion was supported by the fact that the defendant had listed "exterior lights" as a security measure in her answers to plaintiff's interrogatories. *Bourgonje*, 362 Ill. App. 3d at 1003. The court further found that the plaintiff had reasonably relied on the promise, entering into the lease in part because of it "and therefore forsook the opportunity to undertake her own safety precautions," as well as being precluded from undertaking substitute performance herself. *Bourgonje*, 362 Ill. App. 3d at 1005-06, 1007.

Here, even if we were to find a duty, we cannot find such reasonable reliance. In cases of nonfeasance, a plaintiff's reliance on the defendant's promise is "an independent, essential element" for liability in a case of a voluntary undertaking. *Bourgonje*, 362 Ill. App. 3d at 997; *Chisolm v. Stephens*, 47 Ill. App. 3d 999, 1007 (1977) ("the element of reliance lies at the very heart of the cause of action, and is a basic and necessary prerequisite to liability"). A plaintiff's reliance is reasonable where "there is a deceptive appearance that performance had been made, or where a representation of performance has been communicated to plaintiff by defendant, or where plaintiff is otherwise prevented from obtaining knowledge or substitute performance of the undertaking. But, to justify reliance, plaintiff must be unaware of the actual circumstances and not equally capable of determining such facts." *Chisolm*, 47 Ill. App. 3d at 1007.

In the case at bar, we cannot find that plaintiff reasonably relied on Chica's alleged promise to ensure that Acorn inspected the truck. Plaintiff testified that he "got a phone call from

Chica saying that they couldn't find anything wrong with the truck. That's my last time I had anything to do with Acorn over there, when she told me that Acorn couldn't find anything wrong with the brakes." There is no evidence that plaintiff had any further conversation with Cortez or any other party, and his next action was performing his usual inspection of the truck and driving it on the day of the accident.

From plaintiff's conversation with Cortez, it is clear that plaintiff knew that no repairs had been made on the truck: if Acorn could not find anything wrong, there was nothing that would have been repaired. However, plaintiff had just been in a situation where his brakes failed, and testified that when that occurred, he "knew something was wrong with them." Nowhere in his testimony does plaintiff ever use the word "reliance." He never testified that he relied on Cortez's statement that the truck was inspected. Plaintiff asks us to find reliance from the fact that he drove the truck after he heard Cortez tell him that Acorn inspected the truck and found nothing wrong plus the fact plaintiff found nothing wrong with the brakes initially.

Here, plaintiff was capable of determining whether Acorn had in fact inspected the truck. He testified that he brought the truck to Acorn several times and in fact had brought the truck to Acorn and had spoken to someone at Acorn about the brake problems during the incident at issue. There was nothing preventing plaintiff from contacting Acorn about any inspection or repairs. Plaintiff had a cell phone and a call to Acorn would have been reasonable. Accordingly, we cannot find any reliance by plaintiff, and if there was reliance it was not reasonable.

Finally, even if we found that Chica owed plaintiff a duty to ensure that the truck was inspected and breached that duty, Chica would not be liable because Chica's breach was not the

26

proximate cause of plaintiff's injury. " 'Proximate cause requires the plaintiff to show that the defendant's negligence was (1) the actual cause or the cause in fact of his injury, *i.e.*, but for the defendant's conduct, the accident would not have occurred; and (2) the legal cause of his injury, *i.e.*, the defendant's conduct was so closely tied to the plaintiff's injury that he should be held legally responsible for it.' " *Bourgonje*, 362 Ill. App. 3d at 1007 (quoting *McCraw v. Cegielski*, 287 Ill. App. 3d 871, 873 (1996)). While the issue of proximate cause is generally a factual issue, " 'it is well settled that it may be determined as a matter of law by the court where the facts as alleged show that the plaintiff would never be entitled to recover.' " *Bourgonje*, 362 Ill. App. 3d at 995 (quoting *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257-58 (2004)).

Chica's claimed duty was limited to ensuring that Acorn inspected plaintiff's truck, not to inspecting the truck itself. However, plaintiff had brought the truck to Acorn himself and had made Acorn aware of the brake problems, and Acorn had promised to inspect the truck later. Thus, a failure of Chica to contact Acorn would have had no impact on whether Acorn actually inspected and repaired the truck. Moreover, while he argues that it was Chica's responsibility, plaintiff claims that the failure to make the repair was the proximate cause of his injury: plaintiff claims that "Defendant is subject to liability to Plaintiff *** for the injuries he sustained from Defendant's failure to exercise reasonable care to perform [an] inspection and repair of the brakes on his truck. There is no doubt that this failure was a proximate cause of the Plaintiff's injuries." Since the brakes' failure was the proximate cause of the injury, and Chica did not have a duty to repair the brakes, Chica cannot be liable for plaintiff's injury.

In addition, plaintiff claims Chica:

27

"f. Knowingly instructed the Plaintiff, JOHN LEWIS, to

drive the truck with improperly working brakes;

g. Knowingly dispatched the Plaintiff, JOHN LEWIS, to

drive to a job site with a truck that was not equipped with properly

working brakes, seatbelt or a driver's side door."

However, there is no evidence that Chica knew the brakes were working improperly, and even if Chica did know about plaintiff's brake complaints, the brakes' failure was the proximate cause of the injury, not the conduct of Chica. There is no evidence that Cortez dispatched plaintiff to a jobsite. It was plaintiff's idea to drive the truck with the known brake problems. He testified that he drove the truck on the day of the accident because he had not worked for a week.

CONCLUSION

For the reasons set forth above, Chica was not liable for plaintiff's injury and the trial court's grant of summary judgment in Chica's favor was appropriate.

Affirmed.