# Illinois Official Reports

## Appellate Court

---

*St. Paul Mercury Insurance v. Aargus Security Systems, Inc.*,
**2013 IL App (1st) 120784**

---

| | |
|---|---|
| Appellate Court Caption | ST. PAUL MERCURY INSURANCE, a/s/o Mallers Building Limited Partnership, J. RICHMAN, and SPECTRUM PROPERTIES, INC., Plaintiffs-Appellants and Cross-Appellees, v. AARGUS SECURITY SYSTEMS, INC., Defendant-Appellee and Cross-Appellant (Peoples Gas Light and Coke Company, and Peoples Energy Corporation, Defendants). |
| District & No. | First District, Second Division<br>Docket No. 1-12-0784 |
| Filed | December 10, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from the explosion of a propane tank in a commercial building housing tenants engaged in the jewelry business, the trial court properly entered summary judgment for the company that provided security for the building's owner, notwithstanding the allegations of plaintiff insurer, as subrogee of the building owner, that the security company was negligent in allowing delivery of the propane tank and breached its contract by failing to report the delivery, since there was no showing that the security company, under the terms of its contract or through its voluntary undertaking, had any duty to stop or report the delivery of the propane tank. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-6303; the Hon. Eileen M. Brewer, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Cassiday Schade LLP, of Chicago (Julie A. Teuscher, Bradford D. Roth, and Cliff Demosthene, of counsel), for appellants.

Leahy, Eisenberg & Fraenkel, Ltd., of Chicago (Edward J. Leahy and Roland S. Keske, of counsel), for appellee.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Quinn and Justice Simon concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, St. Paul Mercury Insurance, as subrogee of Mallers Building Limited Partnership, and J. Richman and Spectrum Properties, Inc. (Mallers), brought a complaint against defendant Aargus Security Systems, Inc. (Aargus), alleging that Aargus, as security provider for the "Mallers Building," owned by subragors, negligently allowed the delivery of a propane tank that subsequently caused an explosion in the building. The complaint contained one count alleging negligence and one count alleging breach of contract. The circuit court granted Aargus's motion for summary judgment and struck two affidavits Mallers attached to its response to Aargus's summary judgment motion. The circuit court denied Mallers's subsequent motion to reconsider. At issue is: (1) whether a question of fact existed as to whether Aargus had a contractual duty to stop or report the delivery of propane tanks to the building; (2) whether the circuit court improperly struck two of the affidavits Mallers presented in opposition to Aargus's motion for summary judgement; and (3) whether the circuit court erred in denying Mallers's motion for reconsideration.

¶ 2        We hold that the circuit court properly granted summary judgment in Aargus's favor because Mallers failed to show, either by the terms of the contract or through evidence of a voluntary undertaking, that Aargus had a duty to stop or report the delivery of propane tanks to the building; that the circuit court properly struck both affidavits as they failed to comply with Illinois Supreme Court Rule 191 (Ill. S. Ct. R. 191 (eff. Jan. 4, 2013); and that the circuit court properly denied Mallers' motion for reconsideration.

¶ 3                                   JURISDICTION

¶ 4        On November 1, 2011, the circuit court granted Aargus's motion for summary judgment. On February 22, 2012, the circuit court denied Mallers's motion for reconsideration. On March 23, 2012, Mallers timely filed its notice of appeal. Accordingly, this court has jurisdiction

pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

¶ 5                                             BACKGROUND

¶ 6        On May 29, 2009, Mallers filed its complaint against Aargus alleging that its subrogor owned the Mallers Building located at 5 South Wabash in Chicago, Illinois. The building "had various tenants including tenants engaged in the jewelry business." According to the complaint, on April 1, 2002, JR Welding delivered a tank of liquefied petroleum to Maria Pecak, doing business as Betty's Jewelry, in suite 617 of the building. A tenant in a space adjacent to Pecak's, Alfredo Mohedano, accepted the delivery on Pecak's behalf. Pecak later brought the tank to her suite. Plaintiff alleged that "[a] few hours later, *** an explosion occurred on the 6th floor of the *** building resulting in extensive property damage, property loss, building damage, and personal injury." Mallers further alleged "[i]t was later determined that the explosion was the result of the ignition of the liquefied petroleum" tank and that "[t]he tank was damaged and/or defective prior to the time of delivery." Mallers alleged that $14,500,000, had been paid for various insurance claims from the resulting damage.

¶ 7        Aargus, Mallers alleged, "served as the security services contractor for the Mallers Building and its tenants." According to the complaint, there was a time when the use of liquefied petroleum gas was permitted on the premises, specifically:

           "At all times prior to April 1, 2002, when Peoples Gas was performing work on the natural gas lines in the Mallers Building and shut off the natural gas service to the tenants of the Mallers Building, and permitted the use of liquefied petroleum gas on the premises, Aargus served as the security provider."

Mallers alleged that Aargus "continuously permitted several different distributors of liquefied petroleum and/or propane gas tanks to make deliveries" to various tenants of the building and that Aargus "was authorized to search and investigate all deliveries *** and stop the delivery of prohibited or illegal materials and/or substances." Mallers alleged that one of the distributors "known" to Aargus delivered the tank that exploded on April 1, 2002.

¶ 8        Mallers alleged that Aargus "knew or should have known" that a dangerous condition was created by allowing deliveries, and tenants to accept deliveries, of liquefied petroleum and/or propane gas. Furthermore, Mallers alleged that Aargus either knew or should have known that liquefied petroleum and/or propane gas was "prohibited by the City of Chicago Building Code." According to Mallers, Aargus had a duty to exercise ordinary care for the safety of all the building's tenants and that it was negligent because it: allowed and/or facilitated the delivery of the hazardous tanks; allowed and/or facilitated the tenant's use of the hazardous liquefied petroleum gas on the premises; allowed and/or facilitated delivery of the tanks while knowing that it was dangerous and violated local codes; failed to warn others; failed to notify tenants that use of liquefied petroleum gas was prohibited; failed to post notices and warnings in the building regarding the hazardous nature of liquefied petroleum gas; failed to inspect deliveries of hazardous tanks; failed to have an adequate inspection plan; failed to inspect and/or remove liquefied petroleum tanks; failed to warn tenants that liquefied petroleum gas was being used and received on the premises; failed to provide proper personnel to administer

the inspection and removal of hazardous tanks; violated the Chicago municipal code; failed to provide restrictions in leases and policies with tenants prohibiting liquefied petroleum gas tanks on the premises; knew or should have known the general dangers associated with liquefied petroleum gas tanks in buildings; knew or should have known that tenants in the building were accepting deliveries of liquefied petroleum gas tanks; and "[w]as otherwise negligent." Plaintiff alleged that these acts or omissions were the proximate cause of the injuries and damages that occurred, which in turn caused plaintiff to pay out $14,500,000 pursuant to an insurance policy.

¶ 9     The breach of contract count in Mallers's complaint specified that it entered into a "Security Officer Contract" with defendant for the premises on March 29, 1993. Mallers alleged that Aargus, "[w]hile under contract for the provision of security services to the Mallers Building, *** continuously permitted the delivery of liquefied petroleum and/or propane gas to tenants of the Mallers Building." According to plaintiff, allowing such deliveries was a breach of the express and implied terms of the contract.

¶ 10    Mallers attached a copy of the contract to its complaint. The contract, labeled "Security Officer Contract," is dated March 29, 1993. The contract states that the parties to the agreement are "Mallers-Chicago Management Inc., as agent for 5 S. Wabash Building, Chicago, IL 60603," who the contract refers to as the "client," and Aargus. The contract indicates that the "[c]lient desires that Aargus furnish security officers at its premises at" the building. Paragraph one of the contract states, in relevant part:

> "During the term of this contract the Client agrees to use and Aargus agrees to furnish such number of uniformed Security Officers as may from time to time be required by the Client at the Client's premises, and Client agrees to pay Aargus the following per hour rate."

Paragraph one of the contract then goes on to discuss billing rates, hours, holidays, and vacation of the security officers, as well as overtime. The contract provides:

> "The number of Security Officers, Security Officer posts, their location, and the hours and nature of Security Officers' duties may be varied from time to time at Client's request to meet Client's requirements. The protective services provided by Aargus are relative to the scope of the works set forth in paragraph one above, and additional protection is available at greater cost. The furnishing of the security services provided for herein does not guarantee protection against all contingencies."

The contract contains a provision indicating that the security guards are Aargus employees. Specifically, the provision provides as follows:

> "The Security Officers shall perform such security services as the Client shall request but they shall be employees of Aargus, an independent contractor. The payment of *** taxes, Social Security Benefits, unemployment compensation taxes and wages shall be the sole function and responsibility of Aargus."

Additionally, the contract provided:

> "Aargus and the Client agree that Client can give material changes to Aargus' main office representative or the On-Site Aargus Supervisor who shall transmit the

- 4 -

directions to the Security Officers in the post orders or such other directions as the situation may require. Security Officers shall not be allowed to accept any directions from any Mallers' employees other than pursuant to this procedure."

The contract in its entirety is four pages long.

¶ 11       On December 31, 2009, Aargus filed its motion to dismiss pursuant to section 2-619 of the Illinois Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2010)) and a motion for summary judgment against Mallers. Aargus contended that the building "had long contained many jeweler tenants who required the use of various gases as heating sources for manufacturing and repairing jewelry." Aargus asserted that the routine delivery of tanks of various gases to the building was "well known" to Mallers and had a long history. Aargus characterized itself as a "contractor for services" at the Mallers Building and its contract was for "limited security related services at the Mallers Building." According to Aargus, the following facts, prior to the incident, were undisputed: that Mallers never sought or requested "that the property, materials and supplies, including tanks of gas be stopped, checked, inspected or otherwise inspected"; that there is no provision in the contract that obligated it to provide or pay for "staffing or services for stopping, checking, inspecting or in any manner analyzing property, materials or supplies being delivered to and brought onto the *** premises"; and that such services were never assumed or performed by Aargus. Aargus alleged that Mallers, at various times, admitted that it never requested such services nor were such services required under the contract between the parties. According to Aargus, Mallers's complaint sought to impose an "after-the-fact duty upon" it to perform services not contracted for or paid for by Mallers. Aargus argued that Mallers failed to establish any contractual obligation or impose any duty upon Aargus to sustain its claim. Specifically, Aargus asserted that Mallers cannot point to any specific obligation in the contract that establishes a duty owed by Aargus. Furthermore, Aargus argued that none of the alleged breaches alleged by Mallers were covered under the contract.

¶ 12       Defendant included numerous attachments in support of both of its motions, including depositions, a copy of the contract, and requests to admit. Harvey Borders, a security guard employed by Aargus who worked at the building, testified during his deposition that Aargus is a security company that does "building surveillance, customer service type security." When asked what the duties of a security guard at the building are, Borders answered as follows:

"Basically, we work inside a guard room. And there's about eight monitors. We just basically just monitor the cameras. And we do what they call detects rounds. And, basically, that's just walking through the building and just observing the building for anything that might be out of the ordinary."

Borders testified that "[a]fter 6:30 and all day on Sundays and holidays," the guards record the names of the people who enter the building. On a regular day, two or three guards work at a time while on Sundays only one guard works per shift. Borders testified that typically one security guard works in the control room monitoring cameras in the building while the other one is doing rounds. The security guard in the guard room will also answer the phone and answer different questions for people and direct them to where they need to go. Borders testified that each floor had, at the time of the explosion, "at the most," two cameras per floor

which he thought were probably placed at each end of the floor. There were also cameras on the elevators but none in the lobby. When asked whether there were cameras by the freight elevator or the dock at the time of the explosion, Borders answered, "No." Aargus did not keep copies of the videos, but Borders thought the "building did." He did not know who was responsible for the placement of the cameras.

¶ 13 Borders testified as to what occurred during a "detects rounds." He described how each floor, except the lobby, which only has one, has three "detects strips." The security guard walks through the building and swipes each strip with a "detects gun," which registers the swipe with a computer. Borders added that "you just walk through the building from floor to floor swiping each strip. And as you swipe it, basically you [are] just looking for maybe if a door is ajar, if a window's broken, you know, you check the bathrooms for anything out of the ordinary." A security guard does one detects round per shift, and the detects round takes 20 to 30 minutes to perform. When asked, "Do you ever have a reason to go inside a customer's space?" Borders answered "No." In addition to the above-described responsibilities, Borders testified that a security guard "might pass out memos" one or two times per month, and deliver late and rent notices from the management of the building. Borders answered "No" when asked whether a security guard delivers packages. When asked whether Aargus had any responsibilities regarding deliveries in 2002, Borders answered that most of the delivery companies "work that same building every day so they basically know where they want to go. But if its another delivery, most of the time they'll come up through the dock and get on the freight and the freight guy will take them up." Borders explained that there used to be elevator operators in the building that did not work for Aargus, but now the delivery people go up the freight elevator themselves.

¶ 14 Borders testified that Jay Richman, the owner of the building, instructed him on what his duties and responsibilities were at the building. Borders explained that Richman's instructions were "nothing significant" and testified that Richman might leave a package for someone to pick up or ask the security guard to look out for a person suspected of stealing. When asked whether "anybody at Aargus *** or anyone else ever [told] you that when you work as a security guard at the Mallers Building you're supposed to pay attention to whether anyone brings in propane," Borders answered "No." Prior to the explosion, Borders never observed propane tanks in the building. He did sometimes observe a "green, long tank," but he did not know what was in the tank. Prior to the explosion, tank deliveries would go from the dock to the freight elevator, and then onto the desired floor. After the explosion, any tanks delivered to the building were required to be inspected by the management of the building. The new, post-explosion policy was drafted by Mallers, not Aargus.

¶ 15 Borders testified that a security manual was kept in the guard room. The manual described working shifts, hours, break times, the time to do rounds, and a "pass down log" that the security guard was to maintain to let the security guard working the next shift know what had happened or any instructions regarding the building. Borders further testified that prior to the incident, it was a policy of the Mallers Building that tanks had to come in through the dock, not the lobby, and up on the freight elevator. No one had ever told him that propane was not supposed to be in the building. He had received calls from tenants complaining of a gas smell,

and he would then call the engineer, who would then "take care of it." He was not responsible for checking any tanks coming into the building. Borders testified that the delivery of tanks to the building is normal and a usual occurrence.

¶ 16   Paulette Mendoza, a receptionist employed by Mallers Building, LLC, since 2000, testified during her deposition that her supervisor is "J[ay] Richman." As a receptionist, she answers the phone, makes deposits, does filing work, makes copies, and types leases, which Mendoza described as "office work." She testified that the only files in her office are the current leases and invoices such as utility and electric bills. Mendoza testified that when a notice needs to be sent to a tenant, an Aargus security guard will deliver the notice to the tenant. Besides giving notices for Aargus to deliver, Mendoza testified she does not engage in any other communication with any Aargus employees. She testified that inspectors from the city of Chicago perform inspections in the building more than once per year, but not more than five times per year. She does not keep records of the inspections and she was unaware if her supervisor kept them.

¶ 17   When asked what she remembered about the explosion, Mendoza testified that she remembered that there was an explosion in one of the tenant spaces which she thought was on the sixth floor. She testified that the cause of the explosion was a propane tank because that is what she "heard." She did not know when the propane tank was delivered. She testified that she has never seen any kind of gas or propane cylinder or tank in the building, but she has seen an oxygen cylinder or tank being delivered to the building. She now has to "sign off" on all tank deliveries to the building, a policy not in effect prior to the explosion. She did not know if propane was ever allowed into the building. She testified that before the explosion, tanks were to be delivered through the loading dock. She believed that they were then taken up to tenants on the freight elevator.

¶ 18   Mendoza testified that she was to call Aargus "if there is something going on in a tenant space," and that Aargus would call her if there was a problem with the monitors or the camera. The memos she had Aargus distribute occurred maybe one to five times a month and are from the office of the building, not Aargus. Aargus also delivered rent notices one time per month. Prior to the explosion, if Mendoza was not there, Aargus would answer the phone. Aargus was told it was to take a message and give the message to either Mendoza or Richman. Mendoza testified that she had never seen a building safety manual. She "believed" Aargus had a manual, but she had not seen it. When asked what Aargus's duties where, she answered "to watch monitors basically" and "[j]ust to make sure everything is going smoothly in the building. There's no commotion or anything." When asked whether it was supposed to be aware of who enters and exits the building, Mendoza answered "Yes." Mendoza clarified that Aargus was "supposed to watch the people come in and out of the building." When asked whether Aargus was "[t]o look for what, suspicious people," Mendoza answered, "Right. Correct." When asked to define "suspicious person," Mendoza answered that "if they see somebody–either if I get a call from a tenant saying that there's somebody in the hallway that's been there for a while ***, something like that, then I call security and let them know just to keep an eye on them." When asked "based on the deliveries to the building, delivery men

- 7 -

coming in with tanks, they weren't suspicious. They were supposed to be there," Mendoza answered, "Correct."

¶ 19 Salvatore Chiovari, who at the time of the explosion worked as a security guard and an operator of the freight elevator for Aargus at the building, testified during his discovery deposition that he started working for Aargus in 1993 when Jay Richman and his partners took over the building. He ran the freight elevator and testified that his "job was strictly to bring supplies up and down on the freight." Chiovari testified that "we were actually supposed to do whatever *** Richman *** asked us to do." Chiovari testified that from 1993 until the explosion, tanks were taken up and down the freight elevator. When asked whether propane tanks were ever taken up, Chiovari answered that although he took tanks up, he did not look or check to see what kind of tanks they were. He knew of a security manual for Aargus, but he was not familiar with it and had never read it. His supervisor had the manual. Chiovari testified that deliveries were supposed to use the freight elevator, but people would use the passenger elevators if the freight elevator was "preoccupied" or if the delivery person was in a hurry. This also applied to people delivering tanks. Before the explosion, people making deliveries did not have to sign a log. When asked whether the delivery people had to get a badge or temporary identification, he answered "[n]ot to my knowledge, no." He agreed that prior to the explosion people could basically just come and go. When asked whether, prior to the explosion, he was "ever told by anyone what or who you should allow or not allow in the Mallers Building," Chiovari answered that they had "problems with bums" who they "had to chase *** out, but that was about it." He clarified that he was to report anyone that looked "suspicious." He answered "No," when asked whether he was "ever told any type of cargo or goods that you could not let into the Mallers Building." Prior to the explosion, Chiovari was not given any training as to what constituted unlawful activities in the building, he was not told to enforce any provisions of any leases, he was never told anything about "any hazardous materials or hazardous gases," and he was never told anything about propane. Based on his experience in the building, he observed jewelers using torches that he thought were fueled by propane. He would hear jewelers discuss amongst themselves supplies, including propane, that they would use or need. Chiovari testified that jewelers continued to use propane even after an incident that occurred in August of 2000. He could not remember anyone bringing propane into the building on the day of the explosion in 2002. Although he saw Maria Pecak of Betty's Jewelry use a torch to repair jewelry in her shop, he did not know if she used propane gas. After the explosion, Richman told him no propane was allowed in the building. Prior to the explosion, Richman never told him anything about propane.

¶ 20 In 1993, his employer changed to Aargus, and then he only worked the freight elevator. Supplies and materials were only supposed to be brought up the freight elevator. While employed by Aargus, he recalled delivery people telling him that they had propane or oxygen to deliver. He testified he would only know the difference between a propane tank and an oxygen tank if the delivery person told him. Chiovari testified that delivery of tanks was not suspicious and occurred on a daily basis. He agreed that he was to allow tenants to have tanks delivered to them. It was not part of his job to determine what went into the building. He was not supposed to detain anyone or anything and if he saw a suspicious package or person, he

was supposed to call his supervisor. He was not supposed to question people. He testified that the guards were not supposed to accept packages and that they were not supposed to "deal with" packages. According to Chiovari this policy was in effect because they did not want to be accused of stealing jewelry. He agreed that he was a nonarmed security guard. He answered "[c]orrect," when asked whether his "main function was to determine a security issue and report it so that it could be reported to the police."

¶ 21    Jay Richman, during his deposition, was shown a memo dated August 30, 2000 to all tenants of the Mallers Building from the office of the building. Richman could not recall the memo but testified he "probably" drafted it. He testified that Aargus most likely delivered the memo based on "practice and procedure." The memo read that natural gas in the building would be turned off for a period of time. Richman testified that Gary Klein, told him that "the tenants that are using his gas product should get a hold of their oxygen providers to determine what other opportunities exist." Richman testified that he does not know what happened to the security tapes of the sixth floor, but that Aargus was the "custodian of the tapes." He did not know if Maria Pecak had propane in her suite. Richman testified that Joseph Cortese was the director of security in the early 1990s for "Mallers-Chicago." At his request, Cortese provided input in the drafting of the security manual. Richman testified that he had the ability "to go and request things of the security guards." When asked when he first became aware that anybody used propane in the Mallers building, he answered "April 1st of 2002. April 1-1/2 of 2002." Prior to that time he had no knowledge of anyone using propane in the building. Richman testified that he could not recall when asked, "Prior to April 1, 2002, did you ever direct anyone from Aargus Security to stop any delivery people from bringing tanks of any kind into the building?"

¶ 22    Alberto Aguiar, president and owner of A&B Jewelry located in room 608 of the building, testified during his deposition that his company sells, but does not repair, jewelry. Although his company had not done repair work in the past 10 or 12 years, he was familiar with the tools of repair work. He testified that a torch and polishing machine are used, fueled by gas and oxygen. The gas came from a pipeline, not a tank. He agreed that when his company did repair work, the gas was only natural gas from a pipe. He was familiar with other people who do jewelry repair work. He testified that "[e]verybody who repairs jewelry must use a torch," and that people in the jewelry repair business use natural gas and propane to fuel the torches. He opined that many tenants used propane, but stated that "I can't prove that they were using propane." He did see propane tanks in the building, but he was unable to remember where. He does not remember communicating with Richman or Aargus regarding propane and he was not familiar with the procedure and requirements of deliveries to the building. He had not seen or paid attention to tanks being delivered into the building. He was familiar with Maria Pecak, who had a repair shop, Betty's Jewelry, near his own shop. He could not remember if Pecak used a natural gas or propane, but he did see her using a torch, and he never talked to her about using natural gas or propane. He did not know if People's Gas ever authorized the use of propane in the building.

¶ 23    Attached as an exhibit was an amended request to admit in the case of Certain Interested Lloyd's Underwriters of London v. Pecak, Nos. 04 L 003707, 05 L 013256 cons. (Cir. Ct.

Cook Co.). The request to admit was titled "Maller's Amended Responses to Aargus Security Systems, Inc.'s Request to Admit." The following questions, in relevant part, were asked and answered in the request to admit:

"18. Mallers' contract with Aargus *** does not contain any provisions requiring Aargus to inspect any tanks of gas, including *** propane *** tanks, that are delivered to the Mallers Building.

Response: Mallers admits that its contract with Aargus does not have a specific provision that states Aargus is required to inspect any tanks of gas, including *** propane *** tanks, that are delivered to the Mallers Building.

19. Mallers never verbally instructed Aargus Security Systems, Inc. or any of its agents or employees to inspect any tanks of gas, including *** propane *** tanks that are delivered to the Mallers Building.

Response: Mallers admits the facts in Request to Admit No. 19.

20. Neither Aargus*** nor any of its agents or employees ever assumed a duty on behalf of Mallers to inspect deliveries of tanks of gas, including *** propane*** tanks, to the Mallers Building.

Response: Mallers admits that Aargus did not assume a duty 'on behalf of Mallers,' Mallers cannot admit or deny the remaining allegations in Request to Admit No. 20 because it lacks sufficient information upon which to form a conclusion as to whether Aargus or its employees assumed a duty.

* * *

23. Neither Aargus *** nor any of its agents or employees ever assumed a duty on behalf of Mallers to inspect deliveries of any packages entering into or on the premises of the Mallers Building.

Response: Mallers admits that Aargus never assumed a duty 'on behalf of Mallers.' Mallers cannot admit or deny the remaining allegations in Request to Admit No. 23 because it lacks sufficient information upon which to form a conclusion as to whether Aargus or its employees assumed a duty.

* * *

30. Prior to April 1, 2002, Aargus did not inspect any packages or deliveries, including but not limited to *** propane *** tanks or canisters, being brought onto the premises of the Mallers building.

Response: Mallers cannot admit or deny the allegations in Request to Admit No. 30 because it lacks sufficient information upon which to form a conclusion as to actions of Aargus or its employees."

The request to admit was submitted by "Mallers Chicago Management Corporation, Mallers Chicago Limited Partnership, and Jay Richman."

¶ 24    Harold Wojciehowski, during his deposition, testified that he is the site supervisor, employed by Aargus, at the building. He does not carry a weapon and agreed with the statement that he is an "unarmed security officer." He stated that all the security officers at the building are unarmed security officers. At the time of the incident, Wojciehowski supervised

eight employees at the building. When asked "[w]hat type of things fall under security," Wojciehowski answered "[t]heft, loitering, to notify the police if there was a theft[;] *** if there was a fire, we would observe and report to the fire department, give them some information *** whatever we can provide to them." He testified that a walk-through was performed in the common areas of the building four times per day. He thought there were "maybe" 80 cameras in the building at the time of the incident. No "vendor/messenger" log was kept, and delivery people did not need to check in with security. Tenants did not need to show any proof that they were tenants to access their units. There was no security check-in desk at the building for visitors. When asked whether any tenant had ever asked him if propane was allowed in the building, Wojciehowski answered, "No, I don't think–I don't remember anybody ever asking me that." Wojciehowski testified that he never told any tenant that propane was allowed in the building. He was not aware of anybody authorizing or prohibiting propane use in the building. He thought that people in the building used natural gas and oxygen in the torches they used to make jewelry. When asked whether "anybody from the building management ever [told] you *** that deliveries of canisters of any kind were permitted in the building," Wojciehowski answered "No, I didn't have discussions regarding canisters, at least the best I can remember anyways." He never saw a memo or written documentation related to canisters or propane gas. He later clarified that when he referred to building management, he was referring to Jay Richman or his secretary, Paulette Mendoza.

¶ 25    He testified that Aargus has a security manual, that he "believed" Aargus created. It is kept in the building, in the guard or control room. The manual is not given to each Aargus employee, but it is on premises, "presented and expected to be read." He agreed that only "something out of the ordinary would be maybe referred to the building manager." He clarified that he did not know how jewelers in the building were using torches, just that they were being used. He testified that visitors and vendors to the building "may be asked to establish their identity and state their purpose for working in the building." He remembered a person from JR Welding who delivered propane to the building because the man gave him his card. When asked whether JR Welding would have had permission to make a delivery, Wojciehowski responded "[y]eah, I would say." He answered "No" when asked whether anyone from management instructed him not to let the JR Welding man into the building. Prior to the explosion, he had no knowledge that propane tanks were being delivered to tenants. He knew metal canisters or cylinders were being delivered, but he did not know their contents.

¶ 26    Jay Richman, in a February 2, 2005, deposition, testified that he signed the contract between Mallers-Chicago Management, Inc., and Aargus. He did not know if Mallers-Chicago was still a viable entity, and he could not recall if he had any ownership interest in the entity, but testified that he was "[p]robably an agent" of the entity. He could not remember the contract negotiations, but did state that his "guess" would be that he read the contract as he signed it, as it is his "standard operating procedure" to read contracts before he signs them. Richman testified that Aargus provided an operating manual for the building. When asked whether he had "any documents that reflect [his] or anybody else at Mallers-Chicago Management Company, Inc.'s request to Aargus Security to check deliveries made to the *** building before this incident occurred," Richman answered, "I don't recall. You're asking a

question that I don't have an answer to." Richman did not know of any documents that instructed Aargus to check deliveries made to the building. Richman was aware that cylinders were delivered to the building.

¶ 27    Richman could not recall any documentation, or instructions from himself, to Aargus asking it to inspect "tags on cylinders." The only instruction given was to have deliveries made to the freight elevator as opposed to the passenger elevators. He was "not aware of any" instructions given by himself or any entity requiring Aargus to determine what was contained in cylinders entering the building. He did not instruct Aargus to stop deliveries of propane gas to the building. Richman recalled a prior incident, in the year 2000, where someone from "Peoples Gas allowed its customers in the building to bring in alternative gases, one of which being propane, until such time that the gas system was re-energized." Richman stressed that People's Gas would not reenergize a tenant, among other reasons, unless propane was removed. Richman was not aware of any person on staff telling Aargus not to allow propane to be delivered to the building. He was only aware of propane being brought into the building on three occasions: (1) at the directive of People's Gas during "re-energization of the gas distribution system" during an "interim period" of six to eight weeks; (2) when a roofing company that was currently, at the time of the deposition, installing a new roof; and (3) during the repiping of the building.

¶ 28    Richman thought Joe Cortese and Aargus developed the security procedures for the building. Richman further testified, in relevant part:

> "Our involvement, at least my involvement, and I believe my staff's involvement, has always been to let Aargus control access and security.
>
> Where we step in is where if we see somebody that we want them to check out in the common areas, if there's an incident that happens within a tenant's space, a security breach, and if the staff of Aargus is not in our minds performing to what our expectations are; and I mean, you know, for instance, if we walk out of the building after normal business hours and we see, for instance, a guard room that's unattended or a guard sleeping in the guard room, that's where our hypersensitivity and our input comes into play.
>
> Beyond that, we really rely on Aargus in terms of living up to what the policies and procedures have been established over the years."

¶ 29    Richman clarified that "Between the re-energization of the gas distribution system and the 2002 incident, I'm not aware of propane being delivered to the building." He did state that, during this period of time, he did see cylinders being delivered.

¶ 30    Aargus attached a motion for summary judgment, filed by Mallers-Chicago Management Corporation, Mallers Chicago Limited Partnership, and Jay Richman, in case No. 2004 L 3707, consolidated with No. 2004 L 13256 and filed in the circuit court of Cook County, in which it argued, relevant to this appeal, that Mallers stated that "there is some evidence Mallers was aware of tenants['] temporary use of propane following an August 2000 incident which resulted in natural gas service to the building being shut off for several weeks, there is no evidence that Mallers was aware of its use following the restoration of service in

approximately September of 2000." Mallers, in the motion, further stated that "Peoples Gas had advised tenants to discontinue use of propane prior to reconnecting gas services in the building in September of 2001." Mallers stressed in the motion, however, that no evidence was presented in that matter that indicated that Mallers had any knowledge of propane tanks in the building at the time of the explosion.

¶ 31    Aargus attached to its motion a memo from Mallers to the tenants, titled "Tenants who use Peoples Gas as a service provider," dated September 1, 2000. The memo informed the tenants that gas would not be turned on for a few weeks. Furthermore, the memo stated that "[u]ntil that time it was suggested to us that you call your oxygen tank provider and discuss your alternatives with them."

¶ 32    Richman testified during a January 23, 2004, deposition that Aargus provided "[s]ecurity services," which he described as "labor security." As far as letting people into the building, Richman answered that Aargus had a manual. When asked whether "whatever Aargus says is your rules for the building," Richman answered "Yes." Later, Richman answered "Yes," when asked "And as for any visitors to the building, same thing, that would be whatever Aargus Security manual says on the issue?" When asked whether the building had "any policy with respect to delivery of tanks to the building," Richman answered that "[y]ou have to review the Aargus manual," because the building did not have a separate policy.

¶ 33    In response to Aargus's motion for summary judgment, Mallers argued that Aargus was aware of deliveries of propane tanks being made to the building and that it knew or should have known that the tanks presented a danger to the building and its tenants. Mallers argued that Aargus breached a duty of care owed to Mallers and acted in violation of city code because Aargus, as security provider, did not make any effort to stop the propane tank deliveries. Mallers asserted that Aargus knew of the deliveries of propane tanks and had a duty to inform Mallers of their delivery and that it had a contractual duty to stop deliveries of propane tanks. Additionally, Mallers argued that Aargus voluntarily undertook a duty to provide security for the building and did so negligently. According to Mallers, Aargus's alleged negligence ultimately resulted in the delivery of a propane tank on April 1, 2002, which caused $14,500,000 in damages. Therefore, Mallers asked that Aargus's motion for summary judgment be denied. Mallers also attached exhibits to its response, five of which were not already attached as exhibits to Aargus's motion for summary judgment and, thus, were being presented to the court for the first time. Those exhibits were: a copy of the "Mallers Chicago Management Security Manual"; depositions of Alfredo Mohedano and Nancy Fisher; and affidavits from Daniel B. Kennedy and S. Ronald Hauri.

¶ 34    The security manual title page indicates that the manual's contents were restricted to the use of Aargus and Mallers Chicago Management and that the manual was revised on September 20, 2001. In a nondisclosure statement at the front of the document, the manual states that it is "the property of Aargus *** and Mallers Chicago Management" and that it "may not be removed by any employee from the office or work location." The nondisclosure statement lists Jay Richman as the "Owner." On an introduction page, the manual states its purpose as "to establish department procedures, rules, and regulations for the Security Officers and to outline their responsibilities while on duty." Furthermore, the manual states that the

"procedures in the manual will help to minimize and prevent losses to the client, due to security and emergency conditions that can result from fire, theft, explosions, etc." Under the heading, "Enforcement of Tenant Regulations," the manual provides that the landlord has imposed various rules on the tenants. The manual states that "[a]s a representative of the landlord, it is each Security Officer's responsibility to observe and report any violations of these rules." Security officers were to notify a senior employee of a problematic tenant, then if the problem was not corrected, to make a notation of the violation in their shift or daily report. The manual then lists several examples of rules, including that deliveries to tenants must be made through designated corridors. The manual states that "each tenant at the property is responsible for security issues that relate to its space and its property (including its merchandise)." Furthermore, the manual states that a security guard's

> "primary duties include general patrol of interior and exterior areas of the property and observation and prompt reporting of problems or deficiencies as outlined in this Manual. In the course of your daily activities, you are asked to maintain social and business order at the property, without exposing yourself or others to threat of harm. No other duties are to be assumed or implied by a Security Officer."

Additionally, the manual stresses that "Security Officers are reminded that each tenant on the property is responsible for security measures related to its leased space and its contents." Also, "[a] Security Officer must avoid becoming overly involved in the security problems of a tenant; despite a Security Officer's good intentions, tenant security problems are simply not the responsibility of the Security Staff." The manual further provides that "Security Officers must avoid giving information or advise tenants that could be construed as legal advi[ce] or counseling." Under the heading "Special Requests;" the manual provides that "[f]rom time to time, property management may request services of the Security Officer not specifically addressed in this manual."

¶ 35        Under the heading "Theft, Fire and Accident Prevention Duties," the manual states that "[t]he protection of our contracted facilities by Aargus Security Officers is primarily preventative. Therefore, any and every situation which might lead to loss or damage of company property or injury to personnel must be reported." Twelve scenarios, none of which involve inspecting deliveries or deliveries at all, were then listed as examples of "situations" that need to be reported. Under the heading "General Regulations," the manual states that "[s]ecurity personnel are not in the position to judge who should and who should not have access to the building." The provision states further that a security officer should not allow anyone in the building even if that person claims that he or she left his or her keys at home or was locked out. Under the heading "General Information," the manual provides that during normal business hours, "[a]ll tenants, vendors, contractors, salesman, visitors, etc, may be asked to establish their identity and state their purpose for being in the building." The manual further provides that "[p]eople with a need to be in the building will be allowed to enter and exit freely–under normal condition." Under "General Information," the manual states that "[a] Security Officer is never authorized to accept the responsibility for the well being of an individual tenant's premise." Under the heading "General Information," and the subheading "Suspicious Objects or Incidents," the manual provides "[a]dvise the Property Management of

any suspicious incident or the presence of any object or package that appears to be extraneous to the location. If a suspicious object or package is found, do not attempt to handle it."

¶ 36   Alfredo Mohedano, testified during his deposition, that he owned Torres Watch Repair at the time of the explosion on the sixth floor of the building. His shop was next to Betty's Jewelry store, owned by Maria Pecak. He described his observations of the explosion, fire, and his subsequent injuries. The day of the explosion, "[s]ome gas company" tried to deliver a tank to Betty's, but was unable to because she was not there. Mohedano testified that "[t]hey left the tank in [his] place." He described the tank as a four-foot-tall cylinder. He did not have to sign for the delivery. The delivery man asked him if he could leave the tank. Mohedano testified that "[e]verybody used those tanks, so I thought there wouldn't be any problem." He stated that he had seen those tanks in other shops as well, but he did not know what kind of gas was in the tank. He never saw the tanks being brought into the building though, just in other people's shops. The tank was in his shop "an hour, hour and a half." He answered "No," when asked whether he was aware of any rules regarding the use of liquid propane in the building and he could not remember seeing any provision in his lease regarding propane tanks or liquid propane gas in the suites. He had no idea of how deliveries were made to the building.

¶ 37   Nancy Fisher, a general adjustor for subrogee, testified regarding the $14,500,000 in claims filed after the explosion. She did not know if Aargus had to check deliveries of tanks into the building.

¶ 38   Daniel Kennedy, the principal of Forensic Criminology Associates and a professor "in the Sociology and Criminology department as well as the Department of Criminal Justice and Security Administration" at the University of Detroit Mercy, stated in his affidavit that "[t]he provision of high-rise security is far more complicated than other fields of security" due to their "unique hazards and risks." According to Kennedy, "[a] contract security company *** must possess appropriate knowledge and procedures to be able to provide security to the complex technical assignment that a high-rise presents." Kennedy attested that this was especially true with "[t]he advent of September 11, 2001." Kennedy attested further that "[t]he responsibility required of a security company providing these services would include knowledge of any applicable laws, codes or ordinances pertaining to high-rises." Kennedy added that "[t]his would be particularly true in the instance of a prohibition on large propane tanks."

¶ 39   Ronald Hauri, the principal of Hauri Associates, attested in his affidavit that he works in strategic risk management and corporate security service, strategy, and program development and investigative and crisis management. According to Hauri, "[t]he conditions that existed for provision of security on or about April 1, 2002, were much different than those that existed pre-September 11, 2001." As such, security providers to a high-rise building after September 11, 2001, "are tremendously scrutinized and any provider of high-rise security *** knew, or should have been aware of potentially hazardous and/or explosive materials coming into buildings where they provided security." Hauri further stated in his affidavit that "Aargus *** should have stopped the propane tanks coming into the building independent of any lack of specific contract terms," and that "Aargus should [have] notified building management that

- 15 -

propane tanks were entering the building and made recommendations independent of any lack of specific contract terms."

¶ 40 In reply, Aargus argued that Mallers did not dispute any of the material facts or the explicit terms of the contract in its response. Aargus maintained Mallers cannot sustain the duty it sought to impose based on the explicit terms of the contract, the facts, or the case law. Specifically, Mallers failed to show any contract terms that imposed a duty on Aargus to stop propane tank deliveries to the building. Furthermore, Aargus argued that a voluntary undertaking, such as providing security services, is limited to the extent of the undertaking. Aargus also pointed out that it was filing a separate motion to strike the two affidavits filed by Mallers.

¶ 41 As mentioned in its reply, Aargus filed a motion to strike the Hauri and Kennedy affidavits. Aargus argued that these expert witnesses were not previously disclosed and did not comply with Illinois Supreme Court Rule 191. Ill. S. Ct. R. 191 (eff. Jan. 4, 2013). Aargus asserted that Kennedy's and Hauri's affidavits did "not contain any facts that raise a dispute, but merely contain unsupported assertions, opinions, and conclusions." Furthermore, Aargus argued that neither Kennedy nor Hauri had any involvement in the contract or any involvement in the building prior to the incident.

¶ 42 The circuit court later allowed Mallers to file amended affidavits, which it did. Both Hauri's and Kennedy's affidavits were the same except that each added a list of all of the pleadings and material they reviewed prior to making their respective affidavits.

¶ 43 In surreply, Aargus argued that Hauri's and Kennedy's amended affidavits are not premised on facts admissible in evidence and are conclusory. Aargus also pointed out that the only change to the affidavits is the list of materials each affiant reviewed added to the end of each respective affidavit.

¶ 44 During hearing on the motion, counsel for Mallers answered "no," when asked by the court the following question: "[A]m I correct when I say that the only mention of duties here are the provision in No. 3 saying that the security officers duties may be varied from time to time at the client's request to meet the client's requirements? Is there anything else besides that specifies their duties." When asked whether Jay Richman ever instructed Aargus to inspect packages or to stop propane gas from entering the building, counsel for Mallers answered, "No *** with respect to propane tanks." Later in the hearing, the court again asked counsel for Mallers, "Is there any language that specifically requires Aargus security guards to inspect packages?" to which counsel responded "no."

¶ 45 On November 1, 2011, the circuit court granted Aargus's motion for summary judgment and struck the affidavits of Kennedy and Hauri. The court found the affidavits to be "legal conclusions." In granting Aargus's motion for summary judgment, the circuit court made the following findings:

"I have carefully read these documents, and I found no language imposing particular duties on Aargus. The contract itself has no duty or requirement for Aargus to be knowledgeable about the Chicago municipal code. There is no witness who's

- 16 -

testified to voluntary assumption of the duty to inspect. There's no testimony connecting Aargus to the delivery of the propane tank involved in the explosion."

The circuit court further noted that "contracted for duties will not be expanded beyond the explicit terms of the contract," and that Mallers should have contracted for additional services had it wanted them. Specifically, the circuit court stated:

> "The Mallers Building owners didn't bargain or request or reasonably expect these services. There is no contractual obligation to be familiar with the Chicago code. Testimony shows that, for years the Mallers Building had allowed gases in the building."

The circuit court further found that the testimony showed that "the major duty of the security guards was to operate freight elevators and to deliver messages and to do what Mr. Richman told them," and that Aargus security guards "were never told to inspect packages or tanks. They were never told to halt any sort of deliveries." Additionally, the circuit court found that neither the manual nor the contract required Aargus to enforce municipal code nor did it place a duty on the security guards to stop propane or notify management of propane deliveries.

¶ 46    Mallers subsequently filed a motion to reconsider, arguing that the circuit court "missapplied [*sic*] existing law to existing fact in reaching its ruling." Mallers additionally submitted "new law and fact" for the circuit court's consideration. Mallers, in its motion, characterized the manual as a "guide" to help the security guards complete their responsibilities. Mallers asserted that the manual provides that Aargus is to act as a deterrent to physical damage to the building and that the procedures in the manual are meant to minimize and prevent losses based on explosions and fires. According to Mallers, the security manual was evidence of Aargus's voluntary assumption of a duty to protect the building from damage. Mallers further argued that the term "security" in the contract was ambiguous and required the consideration of extrinsic evidence. As extrinsic evidence, Mallers pointed to the language in the manual which states: "[t]he protection of our contracted facilities by Aargus Security Officers is primarily preventative. Therefore, any and every situation which might lead to loss or damage of company property or injury to personnel must be reported." In addition to documents already submitted to the court in prior motions, Mallers additionally submitted an affidavit from Jay Richman. Richman attested that his "understanding" of the contract was that "Aargus would follow all laws, ordinances and codes in force *** in the provision of their security services and not allow any activity, behavior or occurrences on the property that were in contravention thereto." Richman attested further that he "discussed the contract and expectations with Aargus representatives prior to execution."

¶ 47    In response, Aargus argued that Mallers failed to bring forth newly discovered evidence that was not available at the time of the hearing, changes in the law, or errors in the court's prior application of the law. Aargus asked that Richman's affidavit be stricken as Mallers had previously and unsuccessfully sought to introduce an affidavit from Richman at the hearing on the motion for summary judgment. Aargus further argued that Richman had been deposed three times and Mallers wanted to introduce a late affidavit from Richman that would have contradicted his prior testimony.

¶ 48    On February 22, 2012, the circuit court conducted a hearing on the motion to reconsider. During the hearing, the circuit court again asked counsel for Mallers whether anyone "told Aargus to look out for propane tanks," to which Mallers' counsel answered "[s]pecifically, not, your Honor, we can't point to that specific language." The circuit court denied Mallers's motion to reconsider, finding that Aargus "never undertook a duty to check on propane tanks. They never were asked to inspect those tanks and there was nothing either in writing or verbally that required Aargus to take on any kind of additional duties."

¶ 49    On March 23, 2012, Mallers filed its notice of appeal. On April 6, 2012, Aargus filed its motion for cross-appeal, appealing the circuit court's denial of its motion to dismiss.

¶ 50                                    ANALYSIS

¶ 51    Initially, we must make note of what is properly before this court for our review based on the parties' briefs. Mallers, in its initial brief before this court, raised issues that it failed to raise before the circuit court. "It is well established that matters not presented to or ruled upon by the trial court may not be raised for the first time on appeal." *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 229 (1986); *Kostopoulos v. Poladian*, 257 Ill. App. 3d 95, 97 (1993) ("All defects in pleadings are waived by failure to raise them in the circuit court, where they can be handled more expeditiously than on review."). Mallers argues in its brief that "Aargus had a common law duty to prevent or report the delivery of a propane tank to the Mallers Building." Absent from the record, however, is any argument concerning a common law duty Aargus owed to Mallers. We will not consider this argument because Mallers did not raise it before the circuit court. Mallers also argues before this court that admissions it made in another proceeding may not be used against it in this case. Mallers, however, never raised this issue before the circuit court. The admissions now objected to were contained in requests to admit that Aargus attached to its motion for summary judgment. Mallers had the burden to object to the admissions during proceedings on the motion before the circuit court. *Village of Arlington Heights v. Anderson*, 2011 IL App (1st) 110748, ¶ 15. Mallers has waived its objection by failing to object in the circuit court. Furthermore, Mallers did not even raise the issue before this court until its reply brief. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 52    Aargus's brief also included argument that we will not address. Specifically, Aargus cited two orders of this court entered pursuant to Illinois Supreme Court Rule 23 as authority. Ill. S. Ct. R. 23 (eff. July 1, 2011). Orders filed under Illinois Supreme Court Rule 23 may not be cited as precedent by any party except under the limited circumstances, not present here, allowed by Rule 23(e)(1). Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011). Therefore, we have not considered these cases as they were filed pursuant to Rule 23 and Aargus has not made any effort to show that the cited cases fall under the allowable circumstances provided for in Rule 23. Ill. S. Ct. R. 23(e)(1) (eff. July 1, 2011).

¶ 53    The issues that are properly before us and that we will address are as follows: (1) whether a question of fact existed as to whether Aargus had a contractual duty to stop or report the delivery of propane tanks to the Mallers Building; (2) whether the circuit court improperly

- 18 -

struck the affidavits of Daniel Kennedy and Ronald Hauri; and (3) whether the circuit court erred in denying Mallers's motion for reconsideration based on a misapplication of the law.

¶ 54                                                    Summary Judgment

¶ 55        Mallers argues that the circuit court erred in entering summary judgment because the term "security services," as found in the contract, is ambiguous. Mallers argues that a fact question remains based on this alleged ambiguity in the contract, *i.e.*, whether or not Aargus's contractual duty to provide security services included preventing and/or reporting the delivery of propane tanks to the building. Mallers argues that extrinsic evidence needs to be considered based on the alleged ambiguous language in the contract. Specifically, Mallers points to the security manual, the actions of the Aargus security guards, and Jay Richman's deposition testimony.

¶ 56        In response, Aargus argues that the circuit court properly found that under the contract services were to be what was requested and paid for by Mallers, and specifically, what Jay Richman instructed the security guards to do. Aargus maintains the circuit court reviewed all of the evidence, including the contract, the testimony, the security manual, and then properly found that there was no evidence that Mallers ever requested any of the duties that Mallers now seeks to impose, namely, the duty to inspect packages and to prevent hazardous gases from being delivered to the premises.

¶ 57        Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). When determining whether a genuine issue of material fact exists, the pleadings are to be liberally construed in favor of the nonmoving party. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A party opposing a motion for summary judgment "must present a factual basis which would arguably entitle him to a judgment." *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256 (1996). We review summary judgment rulings *de novo*. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995).

¶ 58        A plaintiff alleging negligence must establish that defendant owed a duty of care to the plaintiff, breached that duty of care, and that the defendant's breach proximately caused injuries to the plaintiff. *Chandler v. Illinois Central R.R. Co.*, 207 Ill. 2d 331, 340 (2003). "A duty is an obligation to conform to a certain standard of conduct for the protection of another against an unreasonable risk of harm." *O'Hara v. Holy Cross Hospital*, 137 Ill. 2d 332, 337 (1990). The determination of whether a defendant owes a plaintiff a duty of care is a question of law decided by the court. *Gouge v. Central Illinois Public Service Co.*, 144 Ill. 2d 535, 542 (1991). A defendant is entitled to summary judgment, as a matter of law, where the court finds the defendant did not owe the plaintiff a duty of care. *O'Hara*, 137 Ill. 2d at 337.

¶ 59        Our review of a question of contract construction is also *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). The intent of the parties is our primary objective when construing a contract. *Id.* at 232. The best indication of the parties' intent is found in the plain and ordinary meaning of the language of the contract. *Id.* at 233. We must look to this language first in

determining the parties' intent. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). Extrinsic evidence will only be used if the language is ambiguous. *Gallagher*, 226 Ill. 2d at 233. Ambiguous language is language "susceptible to more than one meaning." *Id.* Summary judgment should not be granted where extrinsic evidence is needed to ascertain the meaning of ambiguous contract language. *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 334 (2005). Unambiguous language, however, must be given its ordinary, plain, and popular meaning. *Thompson*, 241 Ill. 2d at 441. Mere disagreement between the parties concerning a provision's meaning does not automatically render such language ambiguous. *Id.* at 443. We will not view portions, terms, clauses, or language in the contract in isolation. *Id.* at 441. Rather, we will construe the whole contract, "viewing each provision in light of the other provisions." *Id.* Similarly, we will not view contract language outside of the context in which such language is used. *Gallagher*, 226 Ill. 2d at 233. We will not "alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented." *Thompson*, 241 Ill. 2d at 449. "Further, there is a presumption against provisions that easily could have been included in a contract but were not." *Id.*

¶ 60        Negligence allegations based on contractual obligations are defined by the subject contract. *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 525 (2001). "Where a defendant is charged with negligence because of his failure to perform an act allegedly required by contract, the question of whether the defendant had a duty to perform the act is determined by the terms of the contract itself." *Kotarba v. Jamrozik*, 283 Ill. App. 3d 595, 597 (1996). The scope of the defendant's duties will not be expanded beyond that required by the contract. *Id.* at 598.

¶ 61        The voluntary undertaking theory of liability is defined as when "one who gratuitously or for consideration renders services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care or ' "such competence and skill as [one] possesses." ' " *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992) (quoting *Cross v. Wells Fargo Alarm Services*, 82 Ill. 2d 313, 317 (1980), quoting *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 74 (1964)). The voluntary undertaking theory is to be construed narrowly and the duty of care is limited to the extent of the voluntary undertaking. *Lewis v. Chica Trucking, Inc.*, 409 Ill. App. 3d 240, 252 (2011).

¶ 62        In this case, we hold that the circuit court properly entered summary judgment in Aargus's favor because Mallers has not shown, either under the contract or based on a voluntary undertaking, that Aargus had a duty to stop or report the delivery of propane tanks to the building. The contract itself is a short document that basically states that Aargus will provide security officers at the building. Mallers's argument is based on the alleged ambiguity of the term "security services." The term is found in two paragraphs in the contract. First, paragraph three provides:

> "The number of Security Officers, Security Officer posts, their location, and the hours and nature of Security Officers' duties may be varied from time to time at Client's request to meet Client's requirements. The protective services provided by Aargus are relative to the scope of the works set forth in paragraph one above, and additional protection is available at greater cost. The furnishing of the *security services*

provided for herein does not guarantee protection against all contingencies." (Emphasis added.)

Paragraph one in turn, provides, in relevant part, "Aargus agrees to furnish such number of uniformed Security Officers as may from time to time be required by the Client at the Client's premises, and Client agrees to pay Aargus." Paragraph one of the contract then goes on to discuss billing rates, hours, holidays, and vacation of the security officers, as well as overtime. Our review of the term "security services," as it relates to the entire contract, shows that it is not at all ambiguous. The plain language of paragraph three and its reference to paragraph one shows that Aargus agreed to furnish security guards to the building and that their "duties may be varied from time to time at Client's request." We disagree with Mallers's characterization of the language as ambiguous.

¶ 63        The second provision that contains the terms "security services" is found in the contract in paragraph four, which states, in relevant part:

> "The Security Officers shall perform such *security services* as the Client shall request but they shall be employees of Aargus, an independent contractor. The payment of *** taxes, Social Security Benefits, unemployment compensation taxes and wages shall be the sole function and responsibility of Aargus." (Emphasis added.)

We cannot say that the term "security services" in this provision of the contract is ambiguous or even relevant to Mallers's argument as the entire provision, in context, is just a statement of the security guard's employment status.

¶ 64        Our review of the contract shows that it does not provide that Aargus should inspect packages delivered to tenants in the building, the duty Mallers now seeks to impose on Aargus. Mallers's argument is premised on an improper review of isolated terms in the contract as opposed to viewing the contract in its entirety. *Thompson*, 241 Ill. 2d at 441. We will not expand a defendant's duties beyond what the parties agreed upon in a contract. *Kotarba*, 283 Ill. App. 3d at 597-98. Absent from the contract is any mention of a duty to inspect, prevent, or report the delivery of propane tanks to the building. Counsel for Mallers admitted as much during the hearing on the motion for summary judgment when the circuit court asked counsel whether there was "any language that specifically requires Aargus security guards to inspect packages," to which counsel answered, "no." In response to a similar question during the hearing on Mallers's subsequent motion to reconsider, counsel again answered that "we can't point to that specific language."

¶ 65        We also agree with the circuit court's determination that the pleadings and testimony presented failed to show that Aargus voluntarily assumed the duty to inspect packages or deliveries into the building. None of the depositions in the record included any testimony that either a security guard inspected deliveries or that Mallers or its agents instructed the security guards to do so. The voluntary undertaking theory of negligence is to be construed narrowly and the duty of care is limited to the extent of the undertaking. *Lewis*, 409 Ill. App. 3d at 252. Here, there is no evidence that Aargus voluntarily undertook any duty to inspect or prevent propane tanks from entering the building. Both parties provided numerous deposition testimony and evidence, none of which made any mention that Aargus was to prevent deliveries of propane tanks to the building.

- 21 -

¶ 66    We hold that the circuit court properly granted summary judgment in Aargus's favor as Mallers has not shown, either by contract or by a voluntary undertaking, that Aargus had a duty to prevent or report the delivery of propane tanks into the building.

¶ 67                                    Affidavits

¶ 68    Mallers argues that the circuit court improperly struck the affidavits of Daniel Kennedy and Ronald Hauri. According to Mallers, Kennedy and Hauri's affidavits "established a reasonable inference that the affiants could competently opine on the obligations of security officers."

¶ 69    In response, Aargus argues that both Kennedy's and Hauri's affidavits failed to comply with Illinois Supreme Court Rule 191. Ill. S. Ct. R. 191 (eff. Jan. 4, 2013). Aargus maintains that both affidavits are conclusory and unsupported. Aargus further argues that neither affiant had any involvement in the contract or the building prior to the explosion.

¶ 70    Illinois Supreme Court Rule 191 sets forth the requirements of affidavits presented during motions for summary judgment. Ill. S. Ct. R. 191 (eff. Jan. 4, 2013). Rule 191 provides, in relevant part:

> "Affidavits in support of and in opposition to a motion for summary judgment *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." Ill. S. Ct. R. 191 (eff. Jan. 4, 2013).

¶ 71    In this case, we agree with the circuit court's findings that both affidavits consisted of improper legal conclusions. Kennedy opined on the knowledge and procedures a security company in a high-rise must possess while Hauri opined that Aargus should have stopped the delivery of propane tanks into the building. Although we agree with the circuit court's finding that the affidavits consist of conclusions, we also note that neither Hauri nor Kennedy had any personal involvement in the contract between Aargus and Mallers or any prior involvement in the building itself. At issue during the motion for summary judgment was whether Aargus, either by the terms of its contract or by evidence of its own voluntary undertaking, had a duty to inspect or prevent the delivery of propane tanks into the building. The duty of care is a question of law decided by the court. *Gouge*, 144 Ill. 2d at 542. Kennedy's and Hauri's opinions on high-rise security were irrelevant as neither individual was involved in the contract formation or in the security of the building, and they were not at liberty to determine the duty of care. Accordingly, we hold that the circuit court properly struck the Kennedy and Hauri affidavits.

¶ 72                               Motion to Reconsider

¶ 73    Mallers argues that the circuit court improperly denied its motion to reconsider. Mallers's argument is based on its argument that the circuit court erred in applying the law. Due to our

holding in this case that the circuit court properly granted summary judgment, it follows that we also hold that the circuit court properly denied Mallers's motion for reconsideration.

¶ 74                                           Cross-appeal

¶ 75        We note that Aargus filed a cross-appeal arguing that the circuit court erred when it denied its motion to dismiss Mallers's complaint. Mallers asks this court to strike Aargus's cross-appeal. Due to our ultimate conclusion in this case, we do not need to address Aargus's cross-appeal.

¶ 76                                           CONCLUSION

¶ 77        The judgment of the circuit court is affirmed.

¶ 78        Affirmed.